**Sandra BOINTY–TSOTIGH, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. CIV–95–1129–L.**

United States District Court,
W.D. Oklahoma.

Aug. 27, 1996.

James D. Sill, Angela White, Shawnee, OK, for plaintiff.

Patrick M. Ryan, U.S. Attorney, W.D. Okla., Kay Sewell, Ron Pyle, Asst. U.S. Attys., Oklahoma City, OK, for defendant.

## ORDER

LEONARD, District Judge.

On May 15 and 16, 1996, a bench trial was held in the captioned matter. Upon due consideration and review of the evidence, the court makes its findings of facts and conclusions of law as stated below. Initially, the court accepts the following stipulations submitted by the parties:

### Stipulations

1. The Anadarko Indian Health Clinic and the Lawton Indian Hospital (collectively "defendant facilities") and all persons employed therein are agents of the defendant United States of America.

2. Plaintiff Sandra Bointy–Tsotigh was a patient of defendant facilities during the relevant time frame.

3. Physicians providing treatment to plaintiff were at all times acting within the scope of their employment for defendant.

4. Plaintiff developed colorectal cancer. The cancer was first discovered in June of 1994 by a doctor not affiliated with the Indian Health Service.

5. When plaintiff's cancer was discovered, it had metastasized to four of fourteen regional lymph nodes.

### Findings of Fact

1. Plaintiff Sandra Bointy–Tsotigh was born August 15, 1948. Since the death of her husband in June of 1995, plaintiff provides sole support for her 12 and 18 year old daughters and also has another daughter. Plaintiff has a family history of colon cancer.

2. Medical records introduced at trial revealed numerous visits by plaintiff to defendant facilities over the years. Testimony demonstrated four instances in a seventeen month time period in which plaintiff complained of hemorrhoids and/or rectal bleeding to physicians at the defendant facilities. The

dates of these visits were: (1) April 6, 1992; (2) April 28, 1992; (3) August 13, 1993; and (4) September 8, 1993.

3. Physicians at the defendant facilities did not perform the appropriate diagnostic tests to determine the source of plaintiff's rectal bleeding.

4. Plaintiff testified that she returned for all testing requested by physicians at the defendant facilities. However, there was evidence that plaintiff missed at least one scheduled appointment and gave inconsistent and/or incomplete family and social histories to her health care providers.

5. Expert testimony indicated there were other risk factors present in plaintiff's medical history which should alert a physician to the possibility of colorectal cancer and require the physician to act more aggressively in detecting possible cancer. These include a family history of colorectal cancer, previous gynecological cancer, or other pathologies in the bowel such as a prolapsed rectum or hemorrhoids. Evidence indicates each of these factors was present in plaintiff's medical record, but the physicians at the defendant facilities failed to note them in some instances, and disregarded them in others.

6. The court accepts the testimony of Dr. Lewis Hellerstein that plaintiff had a tumor present and growing at the April 6, 1992 visit, the April 28, 1992 visit, and the August 13, 1993 visit and the September 8, 1993 visit. The court finds that at each of these visits, the physicians at the defendant facilities could have diagnosed plaintiff's cancer if they had performed adequate testing.

7. If plaintiff's cancer had been discovered when it first began manifesting symptoms at Stage I, plaintiff would not have had to undergo chemotherapy or radiation.

8. Because the diagnosis was delayed until the cancer had progressed to Stage III, plaintiff had to undergo both chemotherapy and radiation in addition to surgery.

9. Testimony at trial indicated that the chemotherapy and radiation treatments caused plaintiff to lose all of her hair, to become nauseated and to vomit routinely, to

be unable to cook or care for her family, to lose control of her bowel movements, to become unable to work, and to become dependent upon her relatives for her care.

10. If the cancer had been discovered when it first began manifesting symptoms at Stage I, plaintiff's chances of survival for five years would have been approximately 95 to 98 percent.

11. Because the diagnosis was delayed, plaintiff's chances for survival for five years are not more than 20 to 30 percent. Plaintiff has a reduced chance of survival because of the location of the tumor, the fact that four lymph nodes are involved, and because she is young and female. The court accepts Dr. Hellerstein's appraisal that plaintiff's actual chances of five year survival are poor—"in the range of 20 percent."

12. Evidence at trial established that plaintiff suffers emotional distress from her anticipated death, from her concerns of the effect on her elementary-school-aged daughter and her two other children, as well as from her anticipation of the extended treatment she may be forced to undergo in case of recurrence.

13. Dr. John Carter, plaintiff's surgeon, testified that most tumors recur in the first two years following surgery. Plaintiff's surgery took place on June 27, 1994.

14. Plaintiff's cancer is presently undetectable.

15. If plaintiff survives five years from removal of the cancer, she returns to the general population in regard to prognosis and chance of survival.

16. If cancer recurs in the plaintiff, it can be treated. Any future medical expenses incurred by plaintiff in the event of recurrence will be paid by the government or plaintiff's private insurance company.

### Conclusions of Law

1. The court has subject matter jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Personal jurisdiction and venue are proper.

2. Under the Federal Tort Claims Act, the United States is liable in the same manner and to the same extent as a private individual in underlying circumstances. 28 U.S.C. § 2674. Under the Federal Tort Claims Act, the court is to apply the substantive law of the place where the act or omission occurred. Thus the substantive tort law of the state of Oklahoma applies in this action.

3. Under Oklahoma law, the three elements essential to a prima facie case of negligence are: (1) a duty owed by the defendant to protect the plaintiff from injury, (2) a failure to properly exercise or perform that duty, and (3) the plaintiff's injuries are proximately cause by the defendant's failure to exercise his duty of care. *McKellips v. Saint Francis Hospital, Inc.*, 741 P.2d 467, 470 (Okla.1987).

4. In *McKellips*, the Oklahoma Supreme Court adopted the loss of chance doctrine, specifically the approach taken in the Restatement (Second) of Torts, § 323. As applied in the arena of medical malpractice, § 323 relaxes the burden of proof which a plaintiff must provide with regard to causation. *McKellips*, 741 P.2d at 474. The court held that "in medical malpractice cases involving the loss of a less than even chance of recovery or survival where the plaintiff shows that the defendant's conduct caused a substantial reduction of the patient's chance of recovery or survival, irrespective of statistical evidence, the question of proximate cause is for the [factfinder]." *Id.* at 477. The Oklahoma Supreme Court later clarified that it does not matter whether the plaintiff had a better than even chance of recovery or a less than even chance of recovery. *Weiher v. Gupton*, 1995 WL 36425 (Okla. Jan. 31, 1995).

5. As to the assessment of damages, *McKellips* holds that the plaintiff may only recover that part of his total damages which could be attributed to the loss of chance caused by the physician. *McKellips*, 741 P.2d at 477; *Weiher*, 1995 WL 36425 at *3. In cases involving death, the amount of damages recoverable is equal to the percent of chance lost multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action. The factfinder should

select from the figures presented or choose appropriate figures to find the percentage of original chance of survival in the absence of negligence and the percentage of diminished chance resulting from the defendant's negligence in order to determine the net reduced figure. *McKellips,* 741 P.2d at 476.

6. The court in *McKellips* followed the so-called percentage apportionment of damages method as set forth in J. King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353 (1981). In *McKellips,* then, the amount of damages recoverable was equal to the percent of chance lost multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action. 741 P.2d at 476. Significantly, the court stated that statistical evidence is not in itself sufficient to make the damage determination, but that "[f]acts relevant to the particular patient should also be weighed in determining the net reduced figure used to represent the patient's loss of survival chance attributable to the defendant's negligence." *Id.*

7. In *Borgren v. United States,* 723 F.Supp. 581 (D.Kan.1989), the court refused to alter or amend its earlier order awarding judgment in favor of plaintiff on her claim for disfigurement disability, pain, suffering and mental anguish and loss of chance of survival. In the earlier decision, *Borgren v. U.S.,* 716 F.Supp. 1378 (D.Kan.1989), the court found that $800,000.00 was an amount which justly compensated plaintiff on her claim. The court found

> ... the three year delay in diagnosis did result in a loss of a chance to be treated with a lumpectomy or other less disfiguring procedure than the modified radical mastectomy performed, and that she did as a result suffer disfigurement. Further, the court finds by a preponderance of the evidence that Mrs. Borgren has suffered disability along with pain, suffering and mental anguish as a result of her knowledge and belief that she has a decreased chance of disease free survival. Finally, the court finds that the evidence established by a preponderance of the evidence that plaintiff has lost an appreciable

chance to survive. Based on the statistics presented at trial, the plaintiff lost, within a reasonable medical probability, a 30% to 57% chance for ten year disease free survival. Plaintiff was 58 years of age in 1983 (when the cancer should have first been diagnosed) with a probable normal life expectancy of 24.3 years.

*Id.* at 1383.

Defendant argued that the award overcompensated plaintiff and that the damages were improperly calculated.

Upon review, the court noted the three methods which courts have used to determine damages in loss of chance cases. The first method involves the court arriving at a compensatory figure which would justly and adequately compensate the plaintiff for his or her damages. This was the method applied by the *Borgren* court in its earlier decision. The second method, to provide full compensation for the loss of life regardless of chance of survival, was rejected by the court as too onerous for defendants. The third approach, utilized in *McKellips,* is to calculate damages by taking the value of plaintiff's life and multiplying it by the percentage of the chance of survival lost, with the resulting amount being the compensation for the lost chance of survival.

The court in *Borgren* disagreed with defendant that the third method, the percentage apportionment method used in *McKellips,* is preferable over the first method used in *Borgren.* This court finds the reasoning of the *Borgren* court persuasive, especially in light of the fact that, as in the present case before the court, *Borgren* involves a living plaintiff. As stated by the court:

> We feel that there is no real difference between either method. Whichever method is used, the decisionmaker must make a highly subjective decision of what amount of money would fully compensate the plaintiff for her injuries. The [percentage apportionment] approach requires the decisionmaker to make the subjective decision of allotting a monetary amount for the value of plaintiff' life. We agree with plaintiff's counsel that [this] approach basically involves a subjective judgment being mathematically discounted. We are un-

convinced that the mathematical discounting of the subjective value of human life somehow makes that approach any more precise and more accurate than the approach we have chosen. We find that our approach is fair and no less objective than the [percentage apportionment] approach. 723 F.Supp. at 583.

The court emphasized that the $800,000.00 award did not equal the value of plaintiff's life. *Id.* Rather, the amount was one which the court found justly compensated plaintiff for her disfigurement, disability, pain, suffering and mental anguish, and loss of chance of survival. *Id.*

8. Here, defendant argues that the government did not cause plaintiff's cancerous condition and that the court is being asked to speculate regarding harm, *i.e.*, death, which has not occurred. The government stresses that the underlying injury in this case is recurrence of cancer, not death.

Although mindful of the difficulty in awarding appropriate compensation under the facts presented by the case, the court cannot overlook the evidence that defendant's negligence caused plaintiff to suffer damages for which she is entitled to compensation. The court does not, however, agree with plaintiff's suggested method at arriving at the amount of compensation.

In following *McKellips,* plaintiff seeks damages typically allowed in a wrongful death action including medical and burial expenses, loss of companionship, grief of the survivors, mental pain and anguish suffered by the decedent, pecuniary loss to the survivors, and grief and loss of companionship of plaintiff's children. However, since plaintiff is living, the court determines that it would be inappropriate to assess damages based upon the measure of damages for wrongful death under Oklahoma law, as urged by plaintiff. This is especially true in light of the court's instruction in *McKellips* that, "in medical malpractice cases where application of the loss of chance doctrine is appropriate, damages must be limited to only those proximately caused from a defendant's breach of duty." 741 P.2d at 475. Therefore, the court's assessment of an appropriate amount of damages cannot be based on the wrongful death measure of damages since plaintiff's death has not occurred. Rather, the court's assessment of damages is based only on those damages proximately caused by defendant's negligence.

9. The court finds that defendant's negligence caused plaintiff to undergo radiation and chemotherapy treatments and resulting ill effects which she would not have had to endure had defendant not acted in a negligent manner. The court also finds that plaintiff suffered nausea, diarrhea, hair loss, weakness, mental anguish and worry over her condition. The court also finds significant, however, the fact that plaintiff has survived the two-year period after her surgery, the time period during which most tumors recur. The court is also aware that plaintiff is currently being closely monitored for signs of recurrence and can be treated if the cancer returns.

10. The court finds that due to defendant's negligence, plaintiff's 95–98 percent chance of survival over a five year period has instead been replaced by an approximately 20 percent chance. Therefore, the court finds that plaintiff lost an approximately 75 percent chance of survival as a result of defendant's negligence.

11. After considering this statistic as well as other factors peculiar to plaintiff including her age, medical history and other evidence presented at trial, the court determines that plaintiff should recover damages in the amount of $500,000.00. The court finds that, taking into consideration plaintiff's own actions regarding her medical treatment, this amount of damages should be reduced by plaintiff's comparative negligence in the amount of five percent. Judgment will be issued on a separate document in accordance with the Federal Rules of Civil Procedure.