**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 26 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CRYSTAL STAR PHILLIPS,
individually and as next of kin to
Martin Shane Phillips, by and through
her mother, legal guardian and next
friend, MINNIE CHRISTINA
DACZEWITZ; THE ESTATE OF
MARTIN SHANE PHILLIPS; FRED
MARTIN PHILLIPS, JR., parent of
Martin Shane Phillips,

     Plaintiffs - Appellants,

v.

HILLCREST MEDICAL CENTER, an
Oklahoma corporation doing business
in the State of Oklahoma,

     Defendant - Appellee,

and

CAROLYN COBB, a physician;
EMERGENCY PHYSICIANS, INC.,
an Oklahoma corporation doing
business in the State of Oklahoma,

     Defendants.

No. 00-5013

---

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 98-CV-829-H)**

_____

Gregory Von Copeland, Tulsa, Oklahoma, for Plaintiffs-Appellants.

John R. Paul (Christy L. Butler with him on the brief), The Paul Law Firm, Tulsa, Oklahoma, for Defendant-Appellee.

_____

Before **SEYMOUR**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **BELOT**, District Judge.[*]

_____

**BELOT**, District Judge.

_____

Appellants filed this action alleging federal and supplemental Oklahoma state law claims. See 28 U.S.C. §§ 1331, 1367(a). Prior to submitting the case to the jury, the district court granted appellee's Rule 50 motion as to the federal claim. The jury returned a verdict in appellee's favor with respect to the supplemental state law claim. The appeal of the district court's final judgment is now properly before this court. See 28 U.S.C. § 1291. We affirm.

**I. INTRODUCTION**

A. Facts

On Wednesday, September 23,1998, Martin Shane Phillips, accompanied by

---

[*]  Honorable Monti L. Belot, United States District Judge for the District of Kansas, sitting by designation.

his friend and co-worker Mike Lulka, walked into the emergency room of Hillcrest Medical Center (HMC). Phillips complained of severe chest pain and pneumonia-like symptoms. Prior to examining Phillips, HMC staff took background information from Phillips, including whether he was covered under any health insurance plan. Phillips claimed he was covered but could not locate his insurance card. Lulka, who was covered under the same plan from their mutual employer, offered his card to provide HMC administrative staff with the generic information that was equally applicable to the co-workers. HMC staff allegedly indicated on his file that Phillips was not insured.

After initial processing, Phillips was "triaged" by Lugenia Cue,[1] a registered nurse, and then examined by Dr. Carolyn Cobb in the minor care side of the emergency room. After the examination, Phillips was given two prescriptions, discharged from the emergency room, and referred to an Oklahoma medical clinic for follow-up treatment. Though his symptoms failed to subside, Phillips was seen at work on the two days (Thursday and Friday) following his discharge from HMC. Based upon all accounts, his condition was rapidly deteriorating through Saturday and Sunday.

---

[1] When patients arrive at HMC, hospital personnel perform a "triage." Triage is a procedure, first used by military hospitals, to perform an initial assessment of a patient's symptoms in order to direct the patient to the area of care commensurate with his condition. See AMERICAN HERITAGE DICTIONARY 1908 (3d ed. 1992).

Late Sunday night or early Monday morning, Fred Phillips, decedent's father, decided to take Phillips to the emergency room at Tulsa Regional Medical Center (TRMC). They arrived at TRMC, claiming Phillips had been suffering from nausea and vomiting for four to five days. Phillips again gave demographic information and denied, as he had on September 23, the use of illegal drugs. Phillips was initially examined by an emergency room doctor, Dr. Phillip Murta. Dr. Murta believed Phillips was suffering from pneumonia. Dr. Stan Stacy later relieved Dr. Murta and became concerned plaintiff's condition was the result of something more serious than pneumonia. After performing additional tests, Dr. Stacy confirmed Phillips was suffering from bacterial endocarditis. Phillips' condition worsened and he was pronounced dead on September 28, 1998. All parties agree the cause of death was acute bacterial endocarditis.

B. Procedural History

Plaintiffs[2] sued Hillcrest Medical Center, Dr. Carolyn Cobb, and Emergency Physicians, Incorporated (later amended to Tulsa Emergency Physicians, Incorporated (TEP)). The suit related only to the evaluation, diagnosis, and treatment provided Phillips on September 23, 1998. Plaintiffs alleged defendants violated the Emergency Medical Treatment and Active Labor

---

[2] Plaintiffs include Phillips' surviving daughter (Crystal Star Phillips), his Estate (the Estate of Martin Shane Phillips), his father (Fred Phillips, Jr.), and the mother of his daughter (Minnie Christina Daczewitz).

Act (EMTALA) and also brought a claim for wrongful death under Oklahoma medical malpractice law for failing to properly treat Phillips.

Prior to trial, the district court dismissed the EMTALA claim against Dr. Cobb and TEP. The remaining claims were presented to a jury. At the close of evidence, the district court sustained HMC's Rule 50 motion, holding no EMTALA claim existed as a matter of law, and sustained appellants' Rule 50 motion that Dr. Cobb was the agent of HMC.[3] The district court submitted the issue of medical malpractice/wrongful death to the jury and a verdict in favor of HMC was returned. Plaintiffs filed this appeal.

### C. Summary of Issues on Appeal

On appeal, appellants raise four issues. Appellants allege the district court erred in (1) granting HMC's Rule 50 motion as to the EMTALA claim, (2) admitting allegations of Phillips' drug use, (3) excluding plaintiffs' expert testimony regarding the cause of bacterial endocarditis, and (4) refusing to allow cross-examination of HMC's nurse regarding Exhibit 25 and Exhibit 26.

## II. ANALYSIS

### A. EMTALA

Appellants argued at trial that HMC treated Phillips differently than similarly situated patients because he was alleged to be uninsured and that HMC's

---

[3] As such, Dr. Cobb is no longer a party to this case.

established procedures were not followed.  The district court ruled no evidence of differential treatment was presented and, at most, the complained of conduct amounted to negligence.  See Vol. II, pp. 844-45.  At the invitation of the district court,[4] appellants are now pressing similar argument before this court.

## 1.  Standard of Review

This court reviews the grant of judgment as a matter of law de novo, sitting in the same position as the trial court.  See Tyler v. Re/Max Mountain States, Inc., 232 F.3d 808, 812 (10th Cir. 2000).   Pursuant to Rule 50 of the Federal Rules of Civil Procedure, a trial judge may grant a motion for judgment as a matter of law if, after a party has been fully heard on an issue, there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue.  See Tyler, 232 F.3d at 812; Finley v. United States, 82 F.3d 966, 968 (10th Cir. 1996).  This court has read FRCP 50(a) to mean judgments as a matter of law may be granted "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position."  Finley, 82 F.3d at 968; see also Tyler, 232 F.3d at 812 (relying upon Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)) .  As such, the facts and all reasonable inferences from them are viewed in the light most favorable to the

---

[4]  The court stated to appellants' counsel "you certainly can amplify [your argument] many pages over in Denver, but you've certainly got a record here."  Vol. II, p. 852, lns. 3-4.

appellant.  See Finley, 82 F.3d at 968.

## 2.  Legal Framework

Congress enacted EMTALA in 1986 to address the problem of "dumping" patients in need of medical care but without health insurance.  See Abercrombie v. Osteopathic Hosp. Founders Ass'n, 950 F.2d 676, 680 (10th Cir. 1991); Stevison v. Enid Health Sys's, 920 F.2d 710, 713 (10th Cir. 1990).  Though originally intended to cure the evil of dumping patients who could not pay for services, the rights guaranteed under EMTALA apply equally to all individuals whether or not they are insured.  See Collins v. DePaul Hosp., 963 F.2d 303, 308 (10th Cir. 1992) (stating EMTALA also applies to those who are covered by health insurance); see also Summers v. Baptist Med. Ctr. Arkadelphia, 91 F.3d 1132, 1137 (8th Cir. 1996) (en banc) (stating the statute literally applies to "any individual" so a lack of indigency or uninsured status does not defeat an EMTALA claim).  Thus, whether Phillips was or was not actually covered by his employer's insurance plan is of no consequence to the resolution of this issue on appeal.

Under EMTALA, a participating hospital[5] has two primary obligations.  See Ingram v. Muskogee Reg'l Med. Ctr., 235 F.3d 550, 551 (10th Cir. 2000).   First,

---

[5]  The parties agree HMC is a participating hospital and is therefore covered by EMTALA's requirements.  See 42 U.S.C. § 1395dd(e)(2).

- 7 -

the hospital must conduct an initial medical examination to determine whether the patient is suffering from an emergency medical condition.  See Abercrombie, 950 F.2d at 680.  The second obligation requires the hospital, if an emergency medical condition exists, to stabilize the patient before transporting him or her elsewhere.  See Urban v. King, 43 F.3d 523, 525 (10th Cir. 1994).  To ensure compliance with these obligations, Congress created a private cause of action.  See 42 U.S.C. § 1395dd(d); Repp v. Anadarko Mun. Hosp., 43 F.3d 519, 521-22 (10th Cir. 1994).  Appellants' only claim under EMTALA is for an alleged failure to provide an appropriate screening as required by section 1395dd(a).

Pursuant to section 1395dd(a), HMC was required to conduct an "appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists."  42 U.S.C. § 1395dd(a).[6]   This court

---

[6] 42 U.S.C. section 1395dd(a) reads as follows:

Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the  hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

(continued...)

has stated that whether a given hospital has performed an "appropriate medical screening examination," as defined by EMTALA, varies with the unique capabilities of the specific hospital. See Repp, 43 F.3d at 522. Further, we give appropriate deference to the existing screening procedures utilized by the hospital, because it, not a reviewing court, is in a superior position to determine its own capabilities and limitations. See id. at 522 & n.4 ("A court should ask only whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed."). Based upon those pre-existing procedures,[7] adopted and employed by a hospital, the Repp court held EMTALA's screening requirement is violated "when it does not follow its own standard procedures." See id. at 522.

The underlying principle behind section 1395dd(a) is to ensure all patients, regardless of their perceived ability or inability to pay for medical care, are given consistent attention. EMTALA's requirement of an "appropriate screening examination" undeniably requires HMC to "apply uniform screening procedures to all individuals coming to the emergency room." Vickers v. Nash Gen. Hosp.

---

[6](...continued)

[7] When a procedure has not been established by a participating hospital, the inquiry is somewhat different. See, e.g., Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 858 (4th Cir. 1994); Griffith v. Mt. Carmel Med. Ctr., 831 F. Supp. 1532, 1539-40 (D. Kan. 1993). Such is not the case here as the parties agree a policy was in place at HMC.

Inc., 78 F.3d 139, 143 (4th Cir. 1996) (stating uniform treatment for all patients, regardless of ability to pay, is considered "the linchpin of an EMTALA claim"). While this court has never expressly described the obligation under EMTALA in terms of uniform or disparate treatment, several of our sister circuits, as well as numerous district courts within this circuit, have. See id.; Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 323 (5th Cir. 1998); Summers, 91 F.3d at 1138; Holcomb v. Monahan, 30 F.3d 116, 117 (11th Cir. 1994); Scott v. Hutchinson Hosp., 959 F. Supp. 1351, 1357 (D. Kan. 1997) ("A hospital satisfies the requirements of § 1395dd(a) if its standard screening procedure is applied uniformly to all patients in similar medical circumstances."); Tank v. Chronister, 941 F. Supp. 969, 972 (D. Kan. 1996) (quoting Vickers, 78 F.3d at 144) ("EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment . . . ."). To the extent it was unclear before, this court holds, as it implicitly did in Repp, a hospital's obligation under EMTALA is measured by whether it treats every patient perceived to have the same medical condition in the same manner. "Disparate treatment" is simply another term for describing or measuring a hospital's duty to abide by its established procedures. Unless each patient, regardless of perceived ability or inability to pay, is treated in a uniform manner in accordance with the existing procedures, EMTALA liability attaches. See Repp, 43 F.3d at 522.

- 10 -

### 3. Appellants' Claims

Appellants argued to the district court, as they have here, that evidence of a bias towards those who are uninsured is sufficient to state an EMTALA claim. They point to the testimony of Mike Lulka regarding the initial intake procedures HMC undertook and attempt to extrapolate an intolerance towards those perceived to be uninsured.[8]   They also look for support in Christina Daczewitz's testimony that she saw, some time after Phillips' death, a notation of "no insurance" on Phillips' medical records at HMC.  Appellants' repeated attempts to introduce evidence regarding HMC's motives are irrelevant to whether Phillips was treated in a manner consistent with HMC's existing procedures.  This circuit, like many others, does not require any particular motive for EMTALA liability to attach. See Repp, 43 F.3d at 522 n.5 (stating EMTALA imposes strict liability). EMTALA looks only at the participating hospital's actions, not motives.  See Stevison, 920 F.2d at 713 ("We construe [section 1395dd(a)] as imposing a strict liability standard subject to those defenses available in the act."); see also Roberts v. Galen of Virginia, 525 U.S. 249, 252 (1999) (stating the Sixth Circuit's requirement of an improper motive is in conflict with several circuits, including the First, Fourth, Eighth, and D.C. Circuit).  While testimony regarding a

---

[8]  Interestingly, however, Lulka further stated the fact that Phillips did not have on his person the insurance card was not a problem and did not appear to affect the care of Phillips.

hospital's knowledge of a patient's lack of insurance coverage may be relevant to explain a failure to abide by established procedures, it alone does not establish a violation of EMTALA's requirement of uniform treatment.

Moving to the crux of their EMTALA claim, appellants attempted to identify certain HMC policies they claim were not followed. During the Rule 50 colloquy, the district court asked appellants to point to the evidence adduced in support of the EMTALA claim. See Vol. II, p. 827. As they have before this court, appellants pointed to Exhibit 47 (Vol. IV) and an unidentified discharge policy, claiming various aspects of these policies were not followed. The district court repeatedly implored appellants' counsel to describe the evidence showing that HMC failed to screen and evaluate Phillips' condition. In the interest of brevity, it is sufficient to say appellants' counsel reluctantly conceded HMC, either through Nurse Cue and/or Dr. Cobb, did in fact make a determination as to Phillips' condition with respect to each and every allegation of failure to abide by existing policy requirements. See Vol. II, p 829, ln. 19-20; Id. at p. 830, ln. 11 - p. 831, ln. 4; Id. at p. 831, ln. 5 - p. 832, ln. 4; Id. at p. 843, ln. 11 - p. 844, ln. 12. Based upon these admissions and in reliance upon Repp and Tank v. Chronister, 941 F. Supp. 969 (D. Kan. 1996), the district court stated that so long as HMC performed a medical screening examination, consistent with its policies and in an effort to discern whether Phillips was suffering from an emergency medical

condition, EMTALA was satisfied.

Appellants' argument brings into focus the uneasy intersection between EMTALA and state law medical negligence claims. They argue HMC staff failed to appropriately identify and/or appreciate the gravity of Phillips' condition. In other words, while they concede HMC technically complied with their pre-existing standards, the practical effect was an inadequate examination. EMTALA was not, however, designed for such a claim. Though it created a new cause of action, we have consistently recognized EMTALA's provisions have only a limited reach and purpose. See Ingram, 235 F.3d at 552 (citing several cases for the proposition that EMTALA's limited purpose was to eliminate "patient-dumping").

EMTALA does not set a federal standard of care or replace pre-existing state medical negligence laws. See, e.g., Repp v. Anadarko Mun. Hosp., 43 F.3d 519, 522 (10th Cir. 1994); Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994) ("EMTALA is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence."). While providing a guaranty for an "appropriate medical screening," EMTALA, unlike traditional state negligence or malpractice law, does not provide a remedy for an inadequate or inaccurate diagnosis. See Vickers, 78 F.3d at 142. For example, in Collins v. DePaul

Hospital, we stated the purpose of section 1395dd(a)'s screening examination "is to determine whether an 'emergency medical condition exists.' Nothing more, nothing less." Collins, 963 F.2d 303, 306-07 (10th Cir. 1992) (footnote omitted). Thus, while appellants were allowed to go to the jury with their medical malpractice claim for the alleged conduct of HMC's staff,[9] the district court was, as a matter of law, correct in stating no evidence of an EMTALA claim was presented.

### B. Drug Use

In addition to the EMTALA claim, appellants alleged Dr. Cobb and HMC violated the standard of care in the treatment of Phillips. As an affirmative defense, Dr. Cobb and HMC responded Phillips was at fault, invoking Oklahoma's comparative negligence defense, for failing to notify them of his prior drug use. HMC claimed this failure to provide relevant medical information contributed to any negligent care it may have provided.

Prior to trial, appellants moved to exclude any and all evidence of Phillips' alleged drug use. The district court denied this request and allowed testimony that Phillips had used "street drugs" and failed to inform Dr. Cobb of this information when he sought treatment at HMC. The court ruled the evidence was admissible to support HMC's defense of comparative negligence. On appeal,

---

[9]    They did and the jury returned a verdict in favor of HMC and Dr. Cobb.

appellants argue that the evidence was irrelevant and unduly prejudicial.

### 1. Standard of Review

Though appellants moved, in limine, to exclude evidence of drug testimony, they failed to renew their objection at trial. HMC admits this has sufficiently preserved the issue for appellate review. See United States v. Mejia-Alarcon, 995 F.2d 982, 986 (10th Cir. 1993) (stating a motion in limine may preserve the ruling for review when the issue (1) has been fairly presented to the trial court, (2) is the type of issue that can be finally decided in a pretrial hearing, and (3) is ruled upon without equivocation). By presenting the issue to the district court and receiving a definitive ruling, appellants were entitled to rely upon the ruling as the law of the case and to have this court review the decision under an abuse of discretion standard. See id. Under this standard, we will not reverse unless there has been "a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." United States v. Mitchell, 113 F.3d 1528, 1531 (10th Cir. 1997) (internal quotations omitted).

### 2. Relevance

In Oklahoma, evidence of a patient's failure to provide an accurate medical history is relevant to the defense of contributory negligence in a medical malpractice claim. See OKLA. STAT. tit. 23, §§ 13, 14; Graham v. Keuchel, 847

P.2d 342, 358 & n.78 (Okla. 1993) (stating patient's failure to inform the medical staff about her rare blood type may be considered by the jury as an indication of her contributory negligence). In Bointy-Tsotigh v. United States, for example, the plaintiff claimed "[p]hysicians at the defendant facilities did not perform the appropriate diagnostic tests to determine the source" of plaintiff's medical condition. Bointy-Tsotigh, 953 F. Supp. 358, 362 (W.D. Okla. 1996) Despite the defendants' failure to adequately test (or perform "diagnostic tests"), the court reduced plaintiff's damages because she failed to give her accurate medical history to the treating physicians. See id. at 362 (applying Oklahoma law). Based upon Oklahoma law, there can be little doubt Phillips' failure to inform HMC and/or Dr. Cobb of his medical history was relevant and necessary to the defense of contributory negligence.[10]

3. Unfair Prejudice

_____

[10] Appellants have attempted to avoid this result by claiming their negligence claim was based upon Dr. Cobb's failure to "test," not "diagnose," Phillips. It is unclear to this court what, if any, significance this alleged distinction would make to the relevance of Phillips' withholding pertinent medical information from his treating physicians. Because appellants have failed to support this distinction with any authority, legal or otherwise, we need not consider it. See, e.g., Pelfresne v. Village of Williams Bay, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. [The court] will not do his research for him."); Capps v. Cowley, 63 F.3d 982, 984 (10th Cir. 1995) (citing Pelfresne); Robinson v. Tenantry (In re Robinson), 987 F.2d 665, 668 (10th Cir. 1993); Phillips v. Calhoun, 956 F.2d 949, 953 (10th Cir. 1992) (citing Pelfresne).

Even assuming Phillips' failure to inform HMC of his prior drug use was relevant, appellants claim the district court erred because evidence of Phillips' drug use was unfairly prejudicial. Pursuant to Rule 403, the district court must determine whether the admission of relevant evidence would cause unfair prejudice. See FED. R. EVID. 403. Due to the district court's superior position to gauge the testimony's prejudicial impact in light of the evidence presented throughout trial and the jurors' perception of the case as a whole, we give the district court's determination a large degree of deference. See, e.g., Joseph v. Terminix Int'l Co., 17 F.3d 1282, 1284 (10th Cir. 1994).

Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403. According to the literal language of the rule, ordinary prejudice alone is insufficient to exclude relevant evidence. The prejudice must be unfair, such that we may conclude the jurors made their decision based not upon the evidence presented but upon their confusion, passion, or emotion. See, e.g., Stump v. Gates, 211 F.3d 527, 534 (10th Cir. 2000); see also Securities and Exchange Comm'n v. Peters, 978 F.2d 1162, 1171 (10th Cir. 1992) (noting the unfair prejudice must "substantially outweigh" the probative value).

Based upon a review of the proceedings appellants have identified as most egregious, we are unable to conclude any unfair prejudice occurred. The

testimony from HMC and Dr. Cobb's expert simply noted the obvious – drug use is an important indicator of a patient's physical condition and is crucial to determining whether to undertake additional testing. See Vol. II, p. 945.[11] While plaintiffs would have preferred evidence of Phillips' drug use not be presented to the jury, simple prejudice alone is insufficient to warrant exclusion. See Peters, 978 F.2d at 1171 (noting almost all evidence, in the eyes of one party or the other, will be perceived as prejudicial).

C. Causation Testimony

Appellants next contend the district court erroneously excluded testimony of their expert, Dr. Benjamin E. Zola. Dr. Zola apparently would have testified that Phillips' alleged drug use did not cause bacterial endocarditis. The district

---

[11] Specifically, the identified portion of the record reads:

Q: All right. Before we move on, I want to go back to bacterial endocarditis and just ask you for diagnostic purposes is it important for you, the clinician, to know whether or not the patient is using street drugs?

A: I think it is. And much as I indicated earlier in terms of the historic or the setting, the use of street drugs raises your suspicion for infectious processes with particular regard to the heart and much like if you have a history of abnormal heart valves or previous heart surgery.

Vol. II, p. 945, lns. 8-16. In addition, counsel for Dr. Cobb, in opening statement, claimed drug use was relevant to the case because, "for diagnostic purposes the clinician needs to know that because it's well known that [the use of] street drugs is a well known predisposing factor for various infections including bacterial endocarditis, and they need to know that." Vol. I, p. 56, lns. 8-13.

court, however, ruled that evidence of what caused plaintiff's fatal condition was not at issue. See Vol. II, p. 755-56. The court stated the issue was whether Dr. Cobb negligently treated Phillips on September 23, 1998 and whether Phillips contributed, by withholding pertinent health information, to the alleged negligent care. See id. As such, what actually caused bacterial endocarditis was irrelevant to whether Dr. Cobb's treatment fell below the recognized standard of care.

### 1. Standard of Review

Ordinarily, this court would review the exclusion of expert testimony under the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Incorporated, 509 U.S. 579, 589 (1993) . See, e.g., Hynes v. Energy West, 211 F.3d 1193,1202 (10th Cir. 2000) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)). Here, however, the district court did not exclude Dr. Zola's testimony based upon the merits of his expert opinion but rather because the proffered testimony was irrelevant to the issue at hand. This court reviews rulings excluding testimony under an abuse of discretion standard. See Dodoo v. Seagate Tech., Inc., 235 F.3d 522, 528 (10th Cir. 2000). "We will not overturn the trial court unless it has made 'an arbitrary, capricious, whimsical, or manifestly unreasonable judgment[.]'" Id. (citing Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 992 (10th Cir. 1999)).

### 2. Causation of Disease

Appellants made a proffer that Dr. Zola would testify that, based upon a reasonable degree of medical certainty, Phillips' drug use did not cause bacterial endocarditis. See Vol. II, p. 753-55. This testimony was necessary, appellants argue, to rebut arguments or evidence that HMC or Dr. Cobb might present to the effect Phillips caused his own death. The district court stated that the cause of Phillips' bacterial endocarditis was irrelevant to the negligence claim at issue and that Phillips' use of drugs was relevant only to the extent that he failed to inform Dr. Cobb of a pertinent medical condition. See id. at 755. While counsel for HMC and Dr. Cobb were free to argue Phillips withheld pertinent information, the district court rule that "if [counsel for HMC or Dr. Cobb] start even for a moment suggesting that the cause of death was drug use, then there will be serious old testament stuff." Id.

Because appellant has failed to indicate any events contrary to this ruling actually occurred, we are assured all arguments fell well within this ruling. Without evidence alleging Phillips caused his own death, appellants' sole justification for Dr. Zola's testimony vanishes. Accordingly, we hold the district court's decision fell well within his wide discretion. Furthermore, while it may have been appropriate to offer a limiting instruction to the jury, there is no indication appellants requested one. Given appellants' failure, we can not say plain error occurred. See Gilbert v. Cosco Inc., 989 F.2d 399, 404 (10th Cir.

1993); see also United States v. Pedraza, 27 F.3d 1515, 1526 (10th Cir. 1994) (stating the failure to seek a limiting instruction, in a criminal case, may be the result of a tactical decision).

D. Cross-examination

In their fourth and final point, appellants allege evidence of disparate treatment (applicable only to the EMTALA claim) would have been shown if the district court had allowed them to cross-examine HMC's triage nurse, Lugenia Cue, with Exhibits 25 and 26. These exhibits were summaries, prepared by HMC's counsel at the request of appellants, indicating the number of patients admitted to the emergency room (Exhibit 25) and the minor care area of HMC (Exhibit 26) on September 28, 1998. See Vol. IV, Exs. 25 and 26. The information contained in these exhibits showed the time the unnamed patients were admitted and released, a one to two word description of their symptoms, and which side of the hospital they were sent to after initial "triaging." Upon consulting the record, it appears appellants sought to submit these two documents to the jury as definitive proof of differential treatment by HMC. See Vol. I, p. 370-77. The district court ruled this method was unduly confusing to the jurors but invited appellants to question Cue as to Phillips' condition and whether, as a general matter, more patients with those symptoms were triaged to the emergency room on that day or otherwise. See id. at pp. 375-78. Appellants then asked Cue

whether she typically sent more people with chest pain to the minor side or to the emergency side, but when she responded she could make no categorical statement, the issue was pressed no further.  See id. at 378.

### 1.  Standard of Review

As an initial matter, the parties disagree as to what standard of review this court should use to analyze appellants' claim of error.  HMC contends no offer of proof was made as to the content of these exhibits and therefore this court may review only for plain error.  As we have stated before, "[e]rror may not be based on a ruling excluding evidence unless 'the substance of the evidence was made known to the court by offer [of proof] or was apparent from the context within which questions were asked.'" Inselman v. S & J Operating Co., 44 F.3d 894, 896 (10th Cir. 1995) (quoting FED. R. EVID. 103(a)(2)); United States v. Janusz, 135 F.3d 1319, 1323 (10th Cir. 1998) (quoting FED. R. EVID. 103(a)(2)).  The purpose of this rule is obvious – it allows the district court to make an informed evidentiary ruling and creates an adequate record for appellate review to determine whether the trial court's ruling was reversible error.  See Inselman, 44 F.3d at 896.

In order to satisfy Rule 103(a)(2), we have held that "'merely telling the court the content of . . . proposed testimony' is not an offer of proof." Polys v. Trans-Colorado Airlines, Inc., 941 F.2d 1404, 1407 (10th Cir. 1991) (quoting

Gates v. United States, 707 F.2d 1141, 1145 (10th Cir. 1983)). Rather, the proponent of the excluded evidence must explain what he expects the evidence to show and the grounds for which he believes the evidence is admissible. See Polys, 941 F.2d at 1407. If appellants have failed to meet this hurdle, this court can reverse the district court's ruling only if there was plain error that affected appellants' substantial rights. See id. at 1408; FED. R. EVID. 103(d). The plain error exception in civil cases "has been limited to errors which seriously affect the fairness, integrity or public reputation of judicial proceedings." Polys, 941 F.2d at 1408 (internal quotation omitted). It is an extraordinary, nearly insurmountable burden. See id. at 1408 n.5 (collecting cases).

Based upon a review of the record, appellants have sufficiently preserved this issue for appeal. Specifically, the exhibits were identified, their contents and origins discussed, and argument as to their admissibility was made. See Vol. I, pp. 369-76. We hold this more than sufficiently met the demands of Polys. As such, appellants' allegation of error will be reviewed under the less stringent abuse of discretion standard. See Polys, 941 F.2d at 1407. Even under this more lenient standard, however, appellants' argument is unavailing.

2. Exclusion of Testimony

The district court's rationale for excluding the exhibits is that they were rough summaries made by HMC's counsel, were utterly ambiguous, and, without

more information, would be "fundamentally misleading." Vol. I., p. 374. Though not expressed, it appears the court relied upon Rule 403 and determined the evidence, in the form of exhibits 25 and 26, would have painted a distorted picture. In order to allow the alleged differential treatment evidence to be presented to the jury, however, the district court provided a sufficiently effective alternative method.[12] While the district court excluded arguably relevant evidence, it was not an abuse of discretion, especially considering the viable and

---

[12] The colloquy between appellants counsel and the district court went as follows:

> Court: Right. So the question – I mean, you can ask her why it is that she chose, in the face of chest pain, to send him to minor care. And you can even ask her if in more circumstances than not, chest pain goes to the emergency room. But your goal here is to talk about what she saw and heard and what decision she made and why she made them, and whether or not those decisions in the normal course were different than what she normally does.
> Counsel: Is Your Honor saying I can ask her typically do more people go to the emergency side with chest pain?
> Court: Does she send more people to the emergency side.
> Counsel: Yes sir.
> Court: And what was it about this patient that caused her not to do that.
> . . .
> Court: [] The point is, is that with that the one word entry doesn't tell us anything about whether or not somebody should go to the minor care side or ER side; right?
> Counsel: Well, I mean, I think that's something that the witness would certainly be able to explain. But I understand. With my objection noted, Your Honor, I understand the court's ruling.
> Court: No. I understand your objection. All Right.

Vol. I, pp. 375-76.

effective alternatives discussed and agreed to by counsel.  <u>See</u> <u>Deters v. Equifax</u>

<u>Credit Information Servs. Inc.</u>, 202 F.3d 1262, 1274 (2000).

## III.  CONCLUSION

After a thorough review and analysis of all issues fairly presented, we

AFFIRM.