FILED
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**February 24, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

RICKY KOEL,

    Plaintiff - Appellant,

v.

CITIZENS MEDICAL CENTER, INC.;
DANIEL P. KUHLMAN, M.D.; SAM
RODGER FUNK, O.D.; SAM R. FUNK,
O.D., P.A.,

    Defendants - Appellees.

No. 23-3232

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:21-CV-02166-HLT)**
_____

Jonathan Sternberg, Jonathan Sternberg, Attorney, P.C., Kansas City, Missouri (Michaela Shelton, Shelton Law Office, P.A., Overland Park, Kansas, on the briefs) for Plaintiff-Appellant.

Brian C. Wright, Wright Law Office, Chartered, Hays, Kansas, for Defendants-Appellees Citizens Medical Center, Inc., and Daniel P. Kuhlman, M.D. (Lawrence J. Logback and Brenna M. Lynch, Simpson Logback Lynch Norris, P.A., Overland Park, Kansas, with him on the brief, for Defendants-Appellees Sam Rodger Funk, O.D. and Sam R. Funk, O.D., P.A.), for Defendants-Appellees.

_____

Before **TYMKOVICH**, **EBEL**, and **ROSSMAN**, Circuit Judges.
_____

**TYMKOVICH**, Circuit Judge.
_____

Ricky Koel sought emergency care and treatment at Citizens Medical Center, Inc., a hospital in Colby, Kansas, after sustaining serious injuries to his right eye. Citizens evaluated Mr. Koel and eventually released him with medication and instructions to see an ophthalmologist the following morning.  He visited the ophthalmologist and received emergency surgery the next day, but eventually lost vision in his injured eye.

Mr. Koel asserted state-law medical malpractice claims against Citizens and several of Citizens' medical staff.  He also brought a federal claim against Citizens under the Emergency Medical Treatment and Labor Act (EMTALA).  The district court dismissed Mr. Koel's EMTALA claim, concluding that Citizens did not violate the requirements under the Act.

We agree.  EMTALA requires only that a covered hospital provide a medical screening examination according to its capability and stabilize emergency medical conditions that it has actual knowledge of.  We therefore **AFFIRM**.

## I.     Background

On April 10, 2019, Mr. Koel injured his right eye while repairing a wire fence on his farm in rural western Kansas.  He and his wife sought emergency treatment at Citizens.  Mr. Koel's right eye was bleeding, and he was vomiting due to the pain.

Mr. Koel was immediately seen by a triage nurse, who conducted a triage examination and an initial nursing evaluation.  A physician assistant then admitted and evaluated Mr. Koel in Citizens' emergency department.  Citizens did not have an

eye specialist on-site, and thus the physician assistant called Dr. Luther Fry, an ophthalmologist, for advice and left him a message.

Subsequently, Citizens' on-call ER hospitalist, Dr. Daniel Kuhlman, examined Mr. Koel with an ophthalmologic scope and ordered a CT scan. Dr. Kuhlman, who has no training in ophthalmology, was concerned that Mr. Koel may have a globe rupture, although it was not visible or apparent. A possible globe rupture was noted in Mr. Koel's differential diagnosis.[1] An open ruptured globe is clearly and readily visible upon examination, while an occult ruptured globe is not obvious and cannot be seen by the naked eye. A ruptured globe must be surgically closed as soon as possible to avoid loss of vision.

A local optometrist, Dr. Sam Funk, was also called in to examine Mr. Koel. Dr. Funk used a slit lamp to examine Mr. Koel's injured eye, but an open globe rupture was not visible. Dr. Funk performed what is called a Seidel test—a diagnostic procedure used to detect ocular trauma—which did not rule out a possible open globe rupture. At this point, Dr. Funk believed Mr. Koel had a closed globe, not an open globe rupture. Citizens did not have the capabilities to surgically explore Mr. Koel's eye to confirm a suspected ruptured globe.

After a brief phone call with Dr. Funk, Dr. Fry agreed to see Mr. Koel the next morning at his office in Garden City, approximately 100 miles away.

---

[1] It is "common to describe injuries, both penetrating and blunt, as either open-globe or closed-globe injuries, depending on the integrity of the eyeball." *Open-globe versus closed-globe injuries*, 5 ATTORNEYS MEDICAL ADVISOR § 36:378.

Dr. Kuhlman received the interpretation results of Mr. Koel's CT scan after Dr. Funk left the hospital. The radiologist opined that the CT scan showed a "right intraocular hemorrhage and possible component of right globe rupture." Dr. Kuhlman did not share the CT scan results with Drs. Funk or Fry; he testified that the results did not change or add anything to Mr. Koel's diagnosis or treatment plan, which noted that "some degree of right globe rupture [was] possible." App. Vol. I, 57.

Dr. Kuhlman shared the CT scan results with Mr. Koel, including that he had a possible globe rupture which, if correct, may result in loss of vision if it is not immediately closed. He informed Mr. Koel that he had the option of being transferred to a larger ER with more assessment capabilities for further evaluation. Based on his professional judgment, Dr. Kuhlman did not recommend Mr. Koel transfer to another facility because it was possible Mr. Koel may personally incur financial costs for the transportation when he did not have a ruptured globe injury at all. Mr. Koel, who was uninsured, declined to be transferred.

Mr. Koel was discharged from Citizens with multiple medications and instructed to see Dr. Fry the next morning. Dr. Kuhlman recommended Mr. Koel travel to Garden City that evening, even by private transport, for the following morning's appointment, but Mr. Koel and his wife stated that they could not afford the overnight stay. Mr. Koel was informed that he should "return to care" if anything arises before the next morning's appointment.

The next day, Dr. Fry examined Mr. Koel and sent him to see Dr. Nesmith, a retina specialist in Wichita, who conducted surgery that same evening for an occult ruptured globe. Despite his surgery, Mr. Koel ultimately lost vision in his injured eye.

Mr. Koel asserted state-law medical malpractice claims against Citizens and several of the medical professionals who treated him. He also brought a federal claim against Citizens under EMTALA. After a period of discovery, the district court granted summary judgment in favor of Citizens on the EMTALA claim and declined to exercise supplemental jurisdiction for Mr. Koel's remaining state-law claims. Mr. Koel's appeal is limited to the district court's grant of summary judgment on the EMTALA claim.

## II.  Discussion

### A.  *Standard of Review*

We review a summary judgment order de novo, applying the same standards the district court would use in deciding whether to grant the motion. *Ingram v. Muskogee Reg'l Med. Ctr.*, 235 F.3d 550, 551 (10th Cir. 2000). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing FED. R. CIV. P. 56(c)).

5

We review the record in the light most favorable to the non-moving parties to determine if there is a genuine issue of material fact, which would require the case to go to trial. *Urb. By & Through Urb. v. King*, 43 F.3d 523, 525 (10th Cir. 1994).

**B.    EMTALA**

"Congress enacted EMTALA in 1986 to address the problem of 'dumping' patients in need of medical care but without health insurance." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001) ("the rights guaranteed under EMTALA apply equally to all individuals whether or not they are insured"). Dumping occurs when a hospital declines to treat or transfers patients because of their inability to pay. At its core, EMTALA functions to "ensure all patients, regardless of their perceived ability or inability to pay for medical care, are given consistent attention." *Id.* at 797.

Under EMTALA, 42 U.S.C. § 1395dd, a hospital that receives Medicare payments and operates an emergency room has two requirements. "First, if an individual arrives at the emergency room and requests treatment, the hospital must 'provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists.'" *King*, 43 F.3d at 523, 525 (citing 42 U.S.C. § 1395dd(a)). "Second, if the examination reveals the patient is suffering from an emergency medical condition, the hospital usually must stabilize the patient before getting into the business of trying to transfer him elsewhere." *Genova v. Banner Health*, 734 F.3d 1095, 1097 (10th Cir. 2013).

Mr. Koel argues that Citizens violated both its first and second obligation under EMTALA. We disagree for the reasons explained below.

### 1. Appropriate Medical Screening Examination

The first obligation under EMTALA requires hospitals to provide an individual requesting treatment in its emergency room with "an appropriate medical screening examination *within the capability of the hospital's emergency department*, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a) (emphasis added).

We have held that "whether a given hospital has performed an 'appropriate medical screening examination,' as defined by EMTALA, varies with the unique capabilities of the specific hospital." *Phillips*, 244 F.3d at 797. A hospital sets forth which procedures are within its EMTALA capabilities when it establishes a standard screening policy, such as through its rules or bylaws. *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994).

Our review is limited. "We give appropriate deference to the existing screening procedures utilized by the hospital, because it, not a reviewing court, is in a superior position to determine its own capabilities and limitations." *Phillips*, 244 F.3d at 797 (citing *Repp*, 43 F.3d at 522). Accordingly, we inquire only whether the hospital *adhered* to its own procedures; we do not assess the *adequacy* of such procedures. *Repp*, 43 F.3d at 522 & n.4; *see also id.* at 523 (Mere de minimis variations or "slight deviations by a hospital from its standard screening policy" do

not violate EMTALA); *Phillips*, 244 F.3d at 798 ("EMTALA does not set a federal standard of care or replace pre-existing state medical negligence laws.").

Applying those standards, Citizens provided all services and care within its capabilities as required by its bylaws and rules. We look to Citizens' relevant policies, rules, and practices as provided in the record by Citizens' Rules and Regulations, as well as Citizens' Bylaws. *See* App. Vol. III, 61–138 (Medical Staff Rules and Regulations); *id.* at 140–221 (Amended and Revised Medical Staff Bylaws).[2] The two documents describe rules and regulations for Citizens' medical staff, including, but not limited to, physician procedures and administrative duties.

Section 13.1 of Article XIII of Citizens' Rules and Regulations provides definitions relevant under EMTALA. There, "capabilities" is defined as "the hospital's physical space, equipment, and supplies, as well as services made available by the hospital such as . . . surgery." App. Vol. III, 122. It provides that "[t]he hospital's capabilities to provide a medical screening examination and/or stabilizing treatment may be impacted by the availability of specialist and sub-specialists at any particular time." *Id.* Relatedly, evidence in the record indicates that Citizens followed its own standard procedures but lacked the capability—such as the availability to conduct a B-Scan or surgery, or the availability of a specialist—to identify and confirm Mr. Koel's occult globe rupture. App. Vol. VII, 11-12.

---

[2] The district court opinion provides an in-depth description of Citizens' relevant policies, rules, and practices included in the two documents. *See* App. Vol. XX, 121–23. We only discuss those that are relevant to this appeal.

Although Mr. Koel argues that Citizens violated its own rules and procedures, he provides no specific, supporting citations. In fact, much of Mr. Koel's arguments conflate standard or adequacy of care with EMTALA requirements. But it is not the court's function to delve into the adequacy of Citizens' capabilities or Citizens' failure to correctly diagnose Mr. Koel in considering his EMTALA claim. *Phillips*, 244 F.3d at 798. While it may have been beneficial for Mr. Koel if Citizens had the capabilities to confirm his occult globe rupture, such an inquiry is irrelevant because EMTALA, unlike traditional state negligence or medical malpractice law, does not provide a remedy for an inadequate or inaccurate diagnosis. *Id.*

Even so, Mr. Koel contends that Citizens failed to: (1) consult a qualified ophthalmologist regarding his injury, and (2) have a qualified ophthalmologist examine him. Neither is required by Citizens' standard procedure nor is it a part of Citizens' ancillary services routinely available to its emergency department. Section 3.4 of Citizens' Bylaws, titled "Consulting Medical Staff," only notes the qualifications, prerogatives, and obligations of consulting medical staff—there is no obligation that Citizens must consult a specialist. App. Vol. III, 168. Similarly, Section 10.4 of Citizens' Bylaws, titled "Emergency Medical Treatment Exam," provides that a medical screening examination may be conducted by *physicians* (*i.e.*, Drs. Kuhlman and Funk), resident physicians, nurse practitioners, or *physicians' assistants*. App. Vol. III, 200. Again, there is no requirement that a specialist be available to conduct an individual's medical screening examination.

9

Mr. Koel also argues that Citizens, specifically Dr. Kuhlman, failed to forward his CT scan results to Drs. Funk or Fry in violation of its "standard practices" that require "ER staff . . . to forward the patient's information and CT results to a specialist to ask the next step." App. Br. 18. But Citizens' rules and bylaws require no such thing, and Mr. Koel does not provide any record support for this contention.[3]

Alternatively, Mr. Koel appears to allege that Dr. Kuhlman's *own* standard procedure is to defer eye emergencies to a specialist, and also share available information, such as CT scan results, with relevant doctors or specialists. But whether a doctor adhered to his own standard procedure or protocol is irrelevant for purposes of EMTALA. Indeed, case law is clear that violations of EMTALA depend upon whether a *hospital* adhered to *its own standard procedures*. *Phillips*, 244 F.3d at 797; *Repp*, 43 F.3d at 522.

Finally, to the extent Mr. Koel argues that Citizens was biased against him for being uninsured, that argument fails because EMTALA only considers the hospital's actions, not motives. *Phillips*, 244 F.3d at 798 ("Appellants' repeated attempts to introduce evidence regarding [the hospital's] motives are irrelevant to whether [the patient] was treated in a manner consistent with [the hospital's] existing procedures."). Here, Citizens' actions do not demonstrate a violation of EMTALA's requirement of uniform treatment for patients in similar medical circumstances. Nor

---

[3] The district court held that Dr. Kuhlman's decision not to forward Mr. Koel's CT results, if anything, was no more than a de minimis deviation from Citizens' standard procedure. App. Vol. XX, 132.

has Mr. Koel adequately alleged why Citizens would financially benefit from the steps it took.

In sum, we agree with the district court's conclusion that Citizens provided Mr. Koel with an appropriate medical screening within its capability and in adherence to its own standard procedures.

### 2.    *Stabilization and Transfer*

The second requirement under EMTALA provides that "if an individual at a hospital has an emergency medical condition which has not been stabilized . . . , the hospital may not transfer the individual unless" certain conditions are met. *King*, 43 F.3d at 525 (citing 42 U.S.C. § 1395dd(c)(1)). We have previously held that "[a] plain reading of the statute reveals *actual knowledge* of an unstabilized emergency medical condition as a requirement to establish liability." *Id.* (emphasis added) ("The hospital cannot be held to stabilize an emergency situation without knowing an emergency exists."). In other words, EMTALA's stabilization and transfer requirements do not apply *until* the hospital determines and has *actual knowledge* of the individual's unstabilized emergency medical condition. *Id.* at 526.

Mr. Koel argues that he was improperly discharged under EMTALA because he was not stabilized before the discharge. This issue turns on whether Citizens had actual knowledge of Mr. Koel's occult globe rupture.

Based on the record, we find no reasonable jury could find Citizens had actual knowledge of Mr. Koel's specific emergency medical condition—an occult globe rupture. Dr. Funk opined that Mr. Koel did not have an open globe rupture but had a

11

closed globe, for which Citizens provided stabilizing measures. Importantly, as noted above, Citizens did not have the capability (*i.e.*, surgical exploration) to affirmatively identify whether Mr. Koel had an occult globe rupture. Accordingly, Citizens could not have had actual knowledge of Mr. Koel's specific, unstabilized emergency medical condition. And in turn, Citizens could not have been under an obligation to stabilize Mr. Koel for an occult globe rupture before discharging or transferring him because Citizens did not have actual knowledge of Mr. Koel's specific, unstabilized emergency medical condition.

Mr. Koel points to his differential diagnosis to argue that Citizens did know he had a *possible* globe rupture. But knowledge of a possible diagnosis does not equate to having actual knowledge of a diagnosis.[4] Simply put, EMTALA does not require hospitals to provide stabilizing measures to any and all *possible* emergency medical conditions.

Similarly, Mr. Koel argues that he should not have been discharged or transferred because Citizens had actual knowledge that Mr. Koel had *some* medical condition in his injured eye. That argument is unconvincing. First, the stabilization and transfer requirement is only triggered for *emergency* medical conditions. *See* 42 U.S.C. § 1395dd. Second, according to Mr. Koel's logic, hospitals could escape EMTALA liability as long as they provide some sort of stabilizing measure for *an*

---

[4] Mr. Koel does not point to any case law suggesting otherwise. At oral argument, Mr. Koel furthered the argument by stating that Citizens had actual knowledge of relevant symptoms of a globe rupture. But multiple diagnoses, emergency conditions or not, often exhibit the same or similar symptoms.

injury, even if that stabilizing measure does not address the individual's emergency medical condition that the hospital has actual knowledge of. The result would create a loophole that runs contrary to EMTALA's purpose of not "dumping" uninsured patients. *See Phillips*, 244 F.3d at 796.

Finally, any argument that Citizens should have known of Mr. Koel's specific condition is unavailing because EMTALA does not impose a federal standard of medical care. *Id.* at 798.

In sum, the district court did not err in granting summary judgment on Mr. Koel's stabilization and transfer claims.

## III. Conclusion

For the foregoing reasons, we affirm the district court's summary judgment of Mr. Koel's EMTALA claims for Citizens.