BARRETT, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 21A90

### JOHN DOES 1–3, ET AL. *v.* JANET T. MILLS, GOVERNOR OF MAINE, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[October 29, 2021]

The application for injunctive relief presented to JUSTICE BREYER and by him referred to the Court is denied.

JUSTICE BARRETT, with whom JUSTICE KAVANAUGH joins, concurring in the denial of application for injunctive relief.

When this Court is asked to grant extraordinary relief, it considers, among other things, whether the applicant "'is likely to succeed on the merits.'" *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). I understand this factor to encompass not only an assessment of the underlying merits but also a discretionary judgment about whether the Court should grant review in the case. See, *e.g.*, *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*); cf. Supreme Court Rule 10. Were the standard otherwise, applicants could use the emergency docket to force the Court to give a merits preview in cases that it would be unlikely to take—and to do so on a short fuse without benefit of full briefing and oral argument. In my view, this discretionary consideration counsels against a grant of extraordinary relief in this case, which is the first to address the questions presented.

# SUPREME COURT OF THE UNITED STATES

———————

No. 21A90

———————

## JOHN DOES 1–3, ET AL. *v.* JANET T. MILLS, GOVERNOR OF MAINE, ET AL.

### ON APPLICATION FOR INJUNCTIVE RELIEF

[October 29, 2021]

JUSTICE GORSUCH, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting from the denial of application for injunctive relief.

Maine has adopted a new regulation requiring certain healthcare workers to receive COVID–19 vaccines if they wish to keep their jobs. Unlike comparable rules in most other States, Maine's rule contains no exemption for those whose sincerely held religious beliefs preclude them from accepting the vaccination. The applicants before us are a physician who operates a medical practice and eight other healthcare workers. No one questions that these individuals have served patients on the front line of the COVID–19 pandemic with bravery and grace for 18 months now. App. to Application for Injunctive Relief, Exh. 6, ¶8 (Complaint). Yet, with Maine's new rule coming into effect, one of the applicants has already lost her job for refusing to betray her faith; another risks the imminent loss of his medical practice. The applicants ask us to enjoin further enforcement of Maine's new rule as to them, at least until we can decide whether to accept their petition for certiorari. I would grant that relief.

Start with the first question confronting any injunction or stay request—whether the applicants are likely to succeed on the merits. The First Amendment protects the exercise of sincerely held religious beliefs. *Masterpiece Cakeshop, Ltd.* v. *Colorado Civil Rights Comm'n*, 584 U. S.

\_\_\_, \_\_\_–\_\_\_ (2018) (slip op., at 12–14).  Laws that single out sincerely held religious beliefs or conduct based on them for sanction are "doubtless . . . unconstitutional." *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 877 (1990).  But what about other laws?  Under this Court's current jurisprudence, a law may survive First Amendment scrutiny if it is generally applicable and neutral toward religion.  If the law fails either of those tests, it may yet survive but the State must satisfy strict scrutiny.  To do that, the State must prove its law serves a compelling interest and employs the least restrictive means available for doing so.  See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 531–532 (1993); *Smith*, 494 U. S., at 879.

Maine does not dispute that its rule burdens the exercise of sincerely held religious beliefs.  The applicants explain that receiving the COVID–19 vaccines violates their faith because of what they view as an impermissible connection between the vaccines and the cell lines of aborted fetuses.  More specifically, they allege that the Johnson & Johnson vaccine required the use of abortion-related materials in its production, and that Moderna and Pfizer relied on aborted fetal cell lines to develop their vaccines.  Complaint ¶¶61–68.  This much, the applicants say, violates foundational principles of their religious faith.  For purposes of these proceedings, Maine has contested none of this.

That takes us to the question whether Maine's rule qualifies as neutral and generally applicable.  Under this Court's precedents, a law fails to qualify as generally applicable, and thus triggers strict scrutiny, if it creates a mechanism for "individualized exemptions." *Lukumi*, 508 U. S., at 537; see also *Fulton* v. *Philadelphia*, 593 U. S. \_\_\_, \_\_\_–\_\_\_ (2021) (slip op., at 5–6).

That description applies to Maine's regulation.  The State's vaccine mandate is not absolute; individualized ex-

emptions are available, but only if they invoke certain preferred (nonreligious) justifications. Under Maine law, employees can avoid the vaccine mandate if they produce a "written statement" from a doctor or other care provider indicating that immunization "may be" medically inadvisable. Me. Rev. Stat. Ann., Tit. 22, §802(4–B) (2021). Nothing in Maine's law requires this note to contain an explanation why vaccination may be medically inadvisable, nor does the law limit what may qualify as a valid "medical" reason to avoid inoculation. So while COVID–19 vaccines have Food and Drug Administration labels describing certain contraindications for their use, individuals in Maine may refuse a vaccine for other reasons too. From all this, it seems Maine will respect even mere *trepidation* over vaccination as sufficient, but only so long as it is phrased in medical and not religious terms. That kind of double standard is enough to trigger at least a more searching (strict scrutiny) review.

Strict scrutiny applies to Maine's vaccine mandate for another related reason. This Court has explained that a law is not neutral and generally applicable if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon* v. *Newsom*, 593 U. S. \_\_\_, \_\_\_ (2021) (*per curiam*) (slip op., at 1); see also *Fulton*, 593 U. S., at \_\_\_ (slip op., at 6); *Lukumi*, 508 U. S., at 542–546. And again, this description applies to Maine's rule. The State allows those invoking medical reasons to avoid the vaccine mandate on the apparent premise that these individuals can take alternative measures (such as the use of protective gear and regular testing) to safeguard their patients and co-workers. But the State refuses to allow those invoking religious reasons to do the very same thing.

Unpack this point further. Maine has offered four justifications for its vaccination mandate:

> (1) Protecting individual patients from contracting COVID–19;

(2) Protecting individual healthcare workers from contracting COVID–19;

(3) Protecting the State's healthcare infrastructure, including the work force, by preventing COVID–caused absences that could cripple a facility's ability to provide care; and

(4) Reducing the likelihood of outbreaks within healthcare facilities caused by an infected healthcare worker bringing the virus to work. App. to Brief for Respondents, Decl. of Nirav Shah, p. 43, ¶56 (Shah Decl.).

Now consider the first, second, and fourth of these. No one questions that protecting patients and healthcare workers from contracting COVID–19 is a laudable objective. But Maine does not suggest a worker who is unvaccinated for medical reasons is less likely to spread or contract the virus than someone who is unvaccinated for religious reasons. Nor may any government blithely assume those claiming a medical exemption will be more willing to wear protective gear, submit to testing, or take other precautions than someone seeking a religious exemption. A State may not assume "the best" of individuals engaged in their secular lives while assuming "the worst" about the habits of religious persons. *Roberts* v. *Neace*, 958 F. 3d 409, 414 (CA6 2020). In fact, the applicants before us have already demonstrated a serious commitment to public health during this pandemic and expressly stated that they, no less than those seeking a medical exemption, will abide by rules concerning protective gear, testing, or the like. Complaint ¶76.

That leaves Maine's third asserted interest: protecting the State's healthcare infrastructure. According to Maine, "[a]n outbreak among healthcare workers requiring them to quarantine, or to be absent . . . as a result of illness caused by COVID–19, could cripple the facility's ability to

provide care." Shah Decl. 44, ¶56. But as we have already seen, Maine does not dispute that unvaccinated religious objectors and unvaccinated medical objectors are equally at risk for contracting COVID–19 or spreading it to their colleagues. Nor is it any answer to say that, if the State required vaccination for medical objectors, they might suffer side effects resulting in fewer medical staff available to treat patients. If the State refuses religious exemptions, religious workers will be fired for refusing to violate their faith, which will *also* mean fewer healthcare workers available to care for patients. Slice it how you will, medical exemptions and religious exemptions are on comparable footing when it comes to the State's asserted interests.

The Court of Appeals found Maine's rule neutral and generally applicable due to an error this Court has long warned against—restating the State's interests on its behalf, and doing so at an artificially high level of generality. According to the court below, Maine's regulation sought to "protec[t] the health and safety of all Mainers, patients, and healthcare workers alike." *Does 1–6* v. *Mills*, \_\_\_ F. 4th \_\_\_, \_\_\_, 2021 WL 4860328, *6 (CA1, Oct. 19, 2021). But when judging whether a law treats a religious exercise the same as comparable secular activity, this Court has made plain that only the government's *actually asserted* interests as applied to the parties before it count—not *post-hoc* reimaginings of those interests expanded to some society-wide level of generality. *Fulton*, 593 U. S., at \_\_\_ (slip op., at 6); *Tandon*, 593 U. S., at \_\_\_ (slip op., at 2); *Lukumi*, 508 U. S., at 544–545. "At some great height, after all, almost any state action might be said to touch on '. . . public health and safety' . . . and measuring a highly particularized and individual interest" in the exercise of a civil right "'directly against . . . these rarified values inevitably makes the individual interest appear the less significant.'" *Yellowbear* v. *Lampert*, 741 F. 3d 48, 57 (CA10 2014) (quoting J. Clark, Guidelines for the Free Exercise Clause, 83 Harv. L. Rev.

327, 330–331 (1969)). This Court's precedents "do not support such a lopsided inquiry." 741 F. 3d, at 57.

That takes us to the application of strict scrutiny. Strict scrutiny requires the State to show that its challenged law serves a compelling interest and represents the least restrictive means for doing so. *Lukumi*, 508 U. S., at 546. For purposes of resolving this application, I accept that what we said 11 months ago remains true today—that "[s]temming the spread of COVID–19" qualifies as "a compelling interest." *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 592 U. S. ___, ___ (2020) (*per curiam*) (slip op., at 4). At the same time, I would acknowledge that this interest cannot qualify as such forever. Back when we decided *Roman Catholic Diocese*, there were no widely distributed vaccines.[1] Today there are three.[2] At that time, the country had comparably few treatments for those suffering with the disease. Today we have additional treatments and more appear near.[3] If human nature and history teach anything,

_____

[1] Our opinion in *Roman Catholic Diocese* was published on November 25, 2020. COVID–19 vaccines outside of clinical trials weren't available to the public until the following month. See P. Loftus & M. West, First Covid-19 Vaccine Given to U. S. Public, Wall Street J., Dec. 14, 2020, https://www.wsj.com/articles/covid-19-vaccinations-in-the-u-s-slated-to-begin-monday-11607941806.

[2] Over 200 million Americans, nearly seven in ten, have received at least one dose of these vaccines. Nearly six in ten Americans have been fully vaccinated, including about 85% of those older than 65. See CDC, COVID–19 Vaccinations in the United States, COVID Data Tracker (Oct. 28, 2021), http://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total. Among States, Maine has particularly high vaccination rates: About 70% of its population has been fully vaccinated, good for fourth-best in the Nation. See Maine Coronavirus Vaccination Progress, USA Facts (Oct. 26, 2021), https://usafacts.org/visualizations/covid-vaccine-tracker-states/state/maine.

[3] C. Johnson, Merck's Experimental Pill To Treat COVID–19 Cuts Risk of Hospitalization and Death in Half, the Pharmaceutical Company Reports, Washington Post*,* Oct. 1, 2021, https://www.washingtonpost.com/health/2021/10/01/pill-to-treat-covid/ (noting that as of October 1, 2021, "[t]he United States moved a major step closer . . . to having an

it is that civil liberties face grave risks when governments proclaim indefinite states of emergency.

Assuming for present purposes that its interest is a compelling one, Maine has not shown that its rule represents the least restrictive means available to achieve it. The State says that, to meet its four stated goals above, 90% of employees at covered health facilities must be vaccinated. Shah Decl. 43, ¶54; State Respondents' Brief in Opposition 9. The State doesn't offer evidence explaining the selection of its 90% figure. But even taking it as given, Maine does not explain how denying exemptions to religious objectors is essential to its achieving that threshold statewide, let alone in the applicants' actual workplaces. Had the State consulted its own website recently, it would have discovered that, as of last month, hospitals were already reporting a vaccination rate of more than 91%, ambulatory surgical centers 92%, and all other entities roughly 85% or greater.[4] Current numbers may be even higher. What's more, healthcare providers that employ four of the nine applicants in this case already told the media more than a week ago that they have reached 95% and 94% vaccination rates among their employees.[5] Many other States have made do with a religious exemption in comparable vaccine mandates. See Brief for Becket Fund for Religious Liberty as *Amicus Curiae* 13 (observing that the overwhelming major-

———————

easy-to-take pill to treat covid-19 available in the nation's medicine cabinet").

[4] Maine Center for Disease Control and Prevention, Maine Health Care Worker COVID–19 Vaccination Dashboard (Oct. 27, 2021), https://www. maine.gov/dhhs/mecdc/infectious-disease/immunization/publications/health-care-worker-covid-vaccination-rates.shtml.

[5] J. Lawlor, Maine Sees Jump in Vaccinations Among Health Care Workers as Deadline Nears, Lewiston Sun J., Oct. 14, 2021, https://www. sunjournal.com/2021/10/13/maine-reports-893-cases-of-covid-19-over-a-4-day-period (Northern Light Health reporting 95.5% vaccination rate, MaineHealth reporting a 94% rate).

ity of States with similar mandates provide a religious exemption). Maine's decision to deny a religious exemption in these circumstances doesn't just fail the least restrictive means test, it borders on the irrational.

Looking to the other traditional factors also suggests relief is warranted. Before granting a stay or injunctive relief, we ask not only whether a litigant is likely to prevail on the merits but also whether denying relief would lead to irreparable injury and whether granting relief would harm the public interest. *Roman Catholic Diocese*, 592 U. S., at \_\_\_–\_\_\_ (slip op., at 5–7); see also 28 U. S. C. §1651(a). The answer to both questions is clear. This Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod* v. *Burns*, 427 U. S. 347, 373 (1976) (plurality opinion). And as we have seen, Maine has so far failed to present any evidence that granting religious exemptions to the applicants would threaten its stated public health interests any more than its medical exemption already does.

This case presents an important constitutional question, a serious error, and an irreparable injury. Where many other States have adopted religious exemptions, Maine has charted a different course. There, healthcare workers who have served on the front line of a pandemic for the last 18 months are now being fired and their practices shuttered. All for adhering to their constitutionally protected religious beliefs. Their plight is worthy of our attention. I would grant relief.